# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SANTOSH REDDY MANNEY, et al.** | : | |
| | : | **CIVIL ACTION** |
| v. | : | No. 24-760 |
| | : | |
| **U.S. DEPARTMENT OF HOMELAND SECURITY** | : | |
| | : | |

**McHUGH, J.**  May 30, 2024

## MEMORANDUM

This is an action challenging a federal agency's revocation and denial of H-1B visas for four foreign nationals currently residing, or seeking to reside, in the United States. H-1B visas confer legal, non-immigrant status to individuals to work in specialty occupations for specific employers. In late 2023, U.S. Citizenship and Immigration Services revoked or denied Plaintiffs' assigned visas due to alleged fraud by their prospective employers in the visa application process. Plaintiffs have filed suit and now seek a preliminary injunction, contending that the government lacked a legal basis on which to revoke or deny both the visas and their authorizations to remain in the United States. Although the Plaintiffs are, by all accounts, blameless for the revocations and denials, I cannot agree that the agency acted unlawfully. I therefore find that the Plaintiffs are unlikely to succeed on the merits of their claims and must deny the motion for a preliminary injunction.

**I.  Relevant Background**

Plaintiffs Santosh Reddy Manney, Minaxiben Bheekhubhai Solanki, Pavan Kumar Pinagadi, and Pradeepkumar Udu are microbiologists from India. All four men received or expected to receive H-1B visa "cap numbers" to relocate and work in the United States in 2022 or 2023. Compl. (ECF 1).

Foreign nationals seeking to work in the United States cannot directly apply for or receive H-1B visas. Instead, U.S. employers agree to hire specific foreign nationals and apply for H-1B visas on their behalf. If granted, visas are then issued to the employer, permitting them to employ the specific individuals within the U.S. A foreign national employee is thus a beneficiary of an H-1B visa, while their employer is its actual recipient.

Because the number of H-1B visas issued annually is capped by statute, employers apply for the visas in a multi-step "lottery" process. The relevant phases of the process can be summarized as follows:

**Registration.** An employer first submits a "registration" for a prospective foreign national employee. The registration includes information about the employer and the foreign national, as well as an attestation from the employer that they will submit a visa petition if their registration is selected in the lottery. Since the start of fiscal year 2023, employers must also attest that they have not coordinated with others to submit multiple registrations for the same foreign national to unfairly increase their chances of selection.

**Lottery.** USCIS holds a visa lottery to select registrations from among all those submitted, up to the statutory cap.

**Petition.** If an employer's registration is selected from the lottery, the employer submits a visa petition for that specific employee.

**Visa and "Cap Number."** Lastly, if a petition is approved, a visa is conferred to the employer, to employ the specific foreign national. The foreign national also receives a "cap number," signifying that they are counted toward the statutory cap of H-1B visas. With a cap number and approved visa, the individual can lawfully reside in the U.S. to work for the employer as a "non-immigrant alien."

Plaintiffs' visas were obtained or sought on their behalf by two Pennsylvania-based companies: Penn Life Sciences, LLC and KVK-Tech, Inc. Penn Life successfully obtained visas to employ Manney, Solanki, and Pinagadi, and these Plaintiffs were each assigned cap numbers. KVK applied for a visa for Udu, but the application was ultimately denied.[1]

In late 2023, U.S. Citizenship and Immigration Services[2] (USCIS or "the agency") determined that Penn Life and KVK committed "fraud" in their registrations for Plaintiffs' visas. The employers attested under penalty of perjury that they had "not worked with, or agreed to work with, another registrant, petitioner, agent, or other individual or entity to submit a registration to unfairly increase chances of selection for the beneficiary or beneficiaries in [their] submission." Manney Revocation Letter, Ex. 5 at 3 (ECF 10-7); *see also* USCIS Letters, Exs. 6-8. But according to the agency, Penn Life and KVK were actually "related entities" who "worked together to [] submit multiple registrations to unfairly increase chances of selection" of the Plaintiffs' registrations.[3] Manney Revocation Letter, Ex. 5 at 4-5. The agency therefore revoked the employers' H-1B petitions, pursuant to 8 C.F.R. § 214.2(h)(11)(iii)(A)(2):

> The director shall send to the petitioner a notice of intent to revoke the petition in relevant part if he or she finds that . . . [t]he statement of facts contained in the petition [or] H-1B registration (if applicable) . . . was not true and correct, inaccurate, fraudulent, or mispresented a material fact, including if the attestations on the registration are determined to be false.

---

[1] The Complaint alleges that all four Plaintiffs were issued H1-B cap numbers that were later revoked, but at the preliminary injunction hearing, Plaintiffs' counsel did not contest the government's representation that Plaintiff Udu never received a cap number. Plaintiffs' counsel also confirmed that Udu is the only plaintiff not currently located in the United States.

[2] USCIS is a subsidiary agency of the U.S. Department of Homeland Security (DHS).

[3] USCIS premised this determination on several findings, including that: (1) the companies share the same CEO and heads of major departments; (2) the companies listed the same phone number and email address on registrations; and (3) Penn Life and KVK submitted 69 registrations for the same foreign nationals, out of 70 and 72 total submissions, respectively. *See* Manney Revocation Letter, Ex. 5 at 4-5.

3

Revocation of the H-1B petitions also meant the revocation of the visas for Manney, Solanki, and Pinagadi and the denial of the petition for Udu. *See* USCIS Letters, Exs. 6-8; Manney Revocation Letter, Ex. 5 at 1 ("USCIS may revoke an H-1B petition at any time, even after the expiration of the petition, subject to the conditions set forth in [8 C.F.R. § 214.2(h)(11)(iii)(A)].").

Additionally, because the agency determined that the employers committed fraud in registering for and obtaining the H-1B visas – and the visas were now revoked – the agency also revoked the cap numbers of Manney, Solanki, and Pinagadi. The agency made these revocations pursuant to 8 U.S.C. § 1184(g)(3) (also codified at INA § 214(g)(3)), which states in relevant part:

> If an alien who was issued a visa or otherwise provided nonimmigrant status and counted against the numerical limitations of paragraph (1) is found to have been issued such visa or otherwise provided such status by fraud or willfully misrepresenting a material fact and such visa or nonimmigrant status is revoked, then one number shall be restored to the total number of aliens who may be issued visas or otherwise provided such status . . . .

In February, 2024, Plaintiffs filed suit, alleging that the agency's actions violated the Administrative Procedure Act (APA) in three ways. First, they contend that the agency could not require Penn Life or KVK to attest that they had not worked with other entities to unfairly increase the chances that their petitions would be selected, because the agency did not undergo "notice and comment" rulemaking before creating this requirement (Count I).[4] Second, they claim that the agency could not declare the Plaintiffs "inadmissible" to the United States without finding that the Plaintiffs personally made knowing and voluntary misrepresentations in the visa process (Count II). And third, they contend that the agency could not revoke the Plaintiffs' cap numbers without finding that the Plaintiffs personally committed fraud or made a material misrepresentation to obtain them (Count III).

---

[4] Plaintiffs refer to this requirement as the "anti-collusion rule," while the agency calls it the "attestation requirement." This opinion will split the difference and refer to it throughout as the "collusion attestation."

Before the agency answered the complaint, Plaintiffs moved for a preliminary injunction to enjoin it from enforcing the collusion attestation and to stop the accrual of time toward the Plaintiffs' "unlawful presence" in the United States. ECF 10. The motion for an injunction triggered reassignment of this case to me.

At oral argument, Plaintiffs' counsel agreed to withdraw Count II of the complaint, because the government attested in its responsive filing that no Plaintiffs had been deemed "ineligible" to reside in the United States and each remained free to seek new employment.[5] As a result, the remaining issues are (1) whether the agency can require employers to attest that they did not collude with others in the H-1B registration process without undergoing notice and comment rulemaking, and (2) whether the agency can revoke a foreign national's assigned H1-B cap number without finding that the foreign national personally committed fraud or made a material misrepresentation in the visa process.

## II.     Standard of Review

A plaintiff seeking a preliminary injunction must "establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Third Circuit has stated that plaintiffs "must [first] meet the threshold for the first two most critical factors." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). "If the gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken

---

[5] The parties also acknowledged that the Plaintiffs still residing in the United States would soon be in violation of 8 U.S.C § 1182(a)(9)(B)(i)(I) if they did not voluntarily exit the country by May 15th, and that their "unlawful presence" would bar them from returning to the United States for at least three years. With this understanding, I agreed to toll the accrual of time toward the Plaintiffs' "unlawful presence" in the United States until I could properly consider their motion for a preliminary injunction. ECF 17.

together, balance in favor of granting the requested preliminary relief." *Id.* The Supreme Court has further emphasized that the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).[6]

## III. Discussion

### A. *Count I*

Count I alleges a violation of the APA's "notice and comment" rulemaking process. *See* 5 U.S.C. § 553. Plaintiffs maintain that the "rule" could not be enforced against Penn Life or KVK because the agency did not engage in this process before imposing the collusion attestation on employers, with the result that the visas for Plaintiffs could not be denied or revoked on this basis. I conclude that Plaintiffs have standing to bring Count I but are unlikely to succeed on the merits of this claim.

#### 1. **Standing**

As a threshold matter, the agency claims that Plaintiffs lack standing to pursue Count I. To satisfy standing under Article III of the Constitution, a plaintiff must have (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Here, the agency argues that Plaintiffs' alleged injuries are not "fairly traceable" to the agency, but rather are traceable to Penn Life and KVK because the agency would not have revoked Plaintiffs' "cap numbers" but for Penn Life and KVK's fraud. *See* Def.'s Opp'n Br. at 17 (ECF 13).

---

[6] The parties disagree over whether Plaintiffs' proposed preliminary injunction would preserve or alter the status quo in this case, but I need not reach this issue because I the motion for a preliminary injunction will be denied, even assuming that an injunction would maintain the current status quo.

In response, Plaintiffs vaguely proclaim that "[t]he question of beneficiary standing has been answered, and definitively decided against the government's argument." Plfs.' Repl. Br. at 1-2. They cite four district court cases, without further explanation, summarily claiming they "are all extensions of the Third Circuit decision in *Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*, 783 F.3d 156 (3d Cir. 2015)." But *Shalom* dealt exclusively with redressability, not causation or traceability, so it is not at all clear how *Shalom* bears on whether the Plaintiffs here can fairly trace their alleged injuries to the agency. *See* 783 F.3d at 161. Likewise, three of the district court cases that Plaintiffs cite provide little persuasive authority for their position.[7]

Nevertheless, I accept for purposes of this motion that Plaintiffs have standing to challenge the agency's enforcement of the collusion attestation. The government's standing argument is premised on their contention that Penn Life and KVK violated "applicable laws and regulations" in the H-1B registration process, and that these violations caused Plaintiffs' alleged injuries. But Count I directly challenges whether any applicable laws or regulations were, in fact, violated by the employers. If Plaintiffs are proven correct that the collusion attestation could not be enforced, then, by definition, the agency would lack a basis to revoke or deny the visas. In that case, Plaintiffs' injuries would be fairly traceable to the conduct of the agency, not the employers. *See Parcha v. Cuccinelli*, No. 20-15, 2020 WL 607103, at *3 (E.D. Tex. Feb. 7, 2020) (finding it "beyond dispute" that injury suffered by a similarly situated plaintiff was fairly traceable to USCIS' revocation of a visa).

---

[7] *Next Generation Technology, Inc. v. Johnson*, 328 F. Supp. 3d 252, 264 (S.D.N.Y. 2017) is inapplicable here. That court specifically noted it "need not reach the issue of [the employee's] standing" because the employer, whose standing was clear, was also a plaintiff. *Id.* In this case, only the employees are plaintiffs, not the employers. And although the courts in *Tenrec, Inc. v. USCIS*, No. 16-995, 2016 WL 5346095, *4-7 (D. Or. Sept. 22, 2016) and *Pandya v. Jaddou*, 581 F. Supp. 3d 476, 480 (E.D.N.Y. 2022) recognized constitutional standing for nonimmigrant visa beneficiaries, neither court addressed traceability.

Conceptually, traceability is analogous to causation, and there can be more than one cause of an injury. Certainly, the conduct of the employers was a contributing factor to Plaintiffs' misfortune, but it was the combination of the employers' alleged actions and the agency's response that gave rise to the current situation.

## 2.     Likelihood of Success on the Merits

The controlling question presented by Count I is whether the collusion attestation is "substantive" (sometimes called "legislative"), as the Plaintiffs claim, or "interpretive" as the agency claims. "Legislative rules, which have the force of law, impose new duties upon the regulated party. Interpretive rules, on the other hand, seek only to interpret language already in properly issued regulations. Interpretive rules do not add language to or amend language in the statute, but simply state what the administrative agency thinks the statute means, and only remind affected parties of existing duties." *Pa. Dep't of Hum. Servs. v. United States*, 897 F.3d 497, 505 (3d Cir. 2018) (cleaned up). Substantive or legislative rules trigger the notice and comment process, but interpretive rules do not. *Id.*

Plaintiffs argue the collusion attestation is a substantive rule because it ushered in a new prohibition against coordinating with other entities to increase the chances of selection in the lottery by registering for the same foreign nationals.[8] In other words, Plaintiffs contend that before

---

[8] The collusion attestation "rule," according to Plaintiffs, is comprised of two components: (1) a drop-down box on the agency's website, and (2) the actual attestation employers must sign to submit a registration. The drop-down box reads:

> When you submit your registration(s), you must attest, under penalty of perjury, that all of the information contained in the submission is complete, true, and correct. For FY 2023, the attestation that is required before submission will indicate, **"I further certify that this registration (or these registrations) reflects a legitimate job offer and that I, or the organization on whose behalf this registration (or these registrations) is being submitted, have not worked with, or agreed to work with, another registrant, petitioner, agent, or other individual or entity to submit a registration to unfairly increase chances of selection for the beneficiary or beneficiaries in this submission."**

this requirement, "collusion" between at least some entities in the H-1B registration process was permitted. Plfs.' Mot. at 21 (ECF 10) ("[T]he agency was informed of the possibility of collusion, and explicitly rejected a prohibition on the practice . . . .").

The government responds that both collusion and fraud have long been proscribed in the visa process by existing laws and regulations, and as such, the collusion attestation merely reminds employers of an existing duty. They point to 8 C.F.R. § 214.2(h)(2)(i)(G), which USCIS adopted in 2008:

> If USCIS believes that related entities (such as a parent company, subsidiary, or affiliate) may not have a legitimate business need to file more than one H-1B petition on behalf of the same alien . . . USCIS may issue a request for additional evidence or notice of intent to deny, or notice of intent to revoke each petition. If any of the related entities fail to demonstrate a legitimate business need to file an H-1B petition on behalf of the same alien, all petitions filed on that alien's behalf by the related entities will be denied or revoked.

This provision allows the agency to revoke petitions – and thus, to revoke visas, *see* 8 C.F.R. § 214.2(h)(11)(iii)(A)(2) – for "related entities" who file multiple petitions for the same individual without a legitimate business need to do so. The Plaintiffs retort that the collusion attestation goes beyond just "related entities" filing repeat petitions, to now prohibit collusion more

---

> If USCIS finds that this attestation was not true and correct (for example, that a company worked with another entity to submit multiple registrations for the same beneficiary to unfairly increase chances of selection for that beneficiary), USCIS will find that registration to not be properly submitted. Since the registration was not properly submitted, the prospective petitioner would not be eligible to file a petition based on that registration in accordance with the regulatory language at 8 CFR 214.2(h)(8)(iii)(A)(l). USCIS may deny or revoke a petition based on a registration that contained a false attestation and was therefore not properly submitted. Furthermore, USCIS may also refer the individual or entity who submitted a false attestation to appropriate federal law enforcement agencies for investigation and further action as appropriate.

USCIS Registration Website, Ex. 4 (ECF 10-6) (emphasis added). Plaintiffs have not submitted the actual attestation form, but it is uncontested that the emphasized text quotes the attestation.

9

broadly between unrelated entities. *See* Plfs.' Repl. Br. at 3-4 (ECF 14).[9] That is not the situation presented here, because the employers were undeniably related. But even if they were not, it is hardly a substantive change in policy for the agency to clarify that "colluding" to duplicate registrations and manipulate the petition process is prohibited, even if the collaborators had no previous relationship. In adopting the final rule that established the current H-1B visa process, the agency stated (a) its intent "to check the system for duplicate registrations during the registration phase similarly to how USCIS currently checks for duplicate H-1B petition filings," (b) to "mitigate the risk that the registration system will be flooded with frivolous registrations, and (c) to "require completion of an attestation" with "each registration." 84 Fed. Reg. 900. Against this backdrop, the collusion attestation does not appear to impose new, unforeseen obligations on employers, but rather to assist in the enforcement of existing obligations.

Plaintiffs also argue that even if "overlapping registrations between companies" were prohibited, a "safe harbor" existed if multiple employers had legitimate job offers for the same individual. Plfs.' Mot. at 22. But this argument fails because the collusion attestation does not undercut the safe harbor: employers must attest that they have not coordinated with others to "*unfairly* increase chances of selection." If unrelated entities happen to register for the same foreign national, each with legitimate job offers, then they have not coordinated or colluded to "unfairly" increase their chances of selection. Hence no new obligation is placed upon them by the attestation.

Lastly, Plaintiffs point to a form response that the agency offered during the notice and comment period for the new registration process, before the collusion attestation:

---

[9] Ironically, Penn Life and KVK do not dispute that they are "related entities," *see* Revocation Notice, Ex. 5 at 5 (ECF 10-7), so it would appear that the regulations invoked here had long prohibited the type of collusion the agency alleged.

> USCIS believes the current required information is sufficient to identify the registrant and limit potential fraud and abuse of the registration system. If USCIS determines that collecting additional information is necessary for the effective operation of the registration process, USCIS will comply with the [Paperwork Reduction Act] and request OMB approval of any material modifications to that information collection.

84 Fed. Reg. 899. They argue that the collusion attestation is a means of collecting "additional information" in the registration process – information about collusion – so, by its own admission, the agency needed to engage in the notice and comment process. Plfs.' Mot. at 16 ("Based on the agency's prior pronouncements, it viewed any changes to the information gathered with a registration, including attestations, to require compliance with [notice and comment rulemaking]."). But an attestation that employers did not collude with others to unfairly affect the registration process is not a collection of "additional information," it is a means of enforcing what was already prohibited.

Because I conclude that the collusion attestation "only reminded affected parties of existing duties," Plaintiffs are unlikely to succeed on the merits of Count I. *Pa. Dep't of Hum. Servs. v. United States*, 897 F.3d 497, 505 (3d Cir. 2018). The requirement simply reiterates that employers cannot coordinate with other entities for the purpose of unfairly increasing their odds of winning the visa lottery. It does not create or impose any obligation "the basic tenor of which is not already outlined in the law itself." *Dia Nav. Co. v. Pomeroy*, 34 F.3d 1255, 1264 (3d Cir. 1994).

B. *Count III*

Count III alleges that the agency violated the APA by revoking the Plaintiffs' assigned cap numbers without first finding that the Plaintiffs themselves committed fraud or misrepresentation to obtain them. According to Plaintiffs, these revocations exceeded the agency's statutory authority and violated its own procedures. I conclude that the statutory scheme allows the agency

11

to revoke cap numbers for an employer's fraud and therefore find that Plaintiffs are unlikely to succeed on the merits of this claim.

### 1. Standing

The Plaintiffs do not dispute the agency's representation that Udu was never issued a cap number because the agency never approved KVK's visa petition for him. *See* Udu Denial Letter, Ex. 7 at 5 (ECF 10-9). Accordingly, Udu lacks standing for Count III because he has not suffered an injury in fact. *See Lewis v. GEICO*, 98 F.4th 452 (3d Cir. 2024) ("[B]ecause standing is not dispensed in gross, we assess standing for each claim [the plaintiffs] bring." (quotations omitted)). The remaining Plaintiffs were issued cap numbers, so they have suffered a loss that confers standing to bring this claim.

### 2. Likelihood of Success on the Merits

Count III rests on a straightforward question of statutory interpretation. The parties disagree on the meaning of 8 U.S.C. § 1184(g)(3), upon which the agency relied to revoke the Plaintiffs' cap numbers. This provision states in relevant part:

> If an alien who was issued a visa or otherwise provided nonimmigrant status and counted against the numerical limitations of paragraph (1) is found to have been issued such visa or otherwise provided such status by fraud or willfully misrepresenting a material fact and such visa or nonimmigrant status is revoked, then one number shall be restored to the total number of aliens who may be issued visas or otherwise provided such status . . . .

8 U.S.C. § 1184(g)(3).

The Plaintiffs read the statute to say that the agency may revoke an assigned cap number (*i.e.*, revoke an alien's nonimmigrant status) for fraud or misrepresentation *only if the individual* committed the fraud or misrepresentation. They maintain that if the employer committed the fraud or misrepresentation to obtain the visa, the cap number cannot be stripped from the individual. The statute's text does not specify *who* must have committed the fraud or misrepresentation, so

12

Plaintiffs point to another statute, 8 U.S.C. § 1182(a)(6)(C)(i), which they contend provides essential context. That provision mirrors the phrase "by fraud or willfully misrepresenting a material fact" but is specific to "aliens," not their employers:

> Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible.

8 U.S.C. § 1182(a)(6)(C)(i).

I cannot agree with Plaintiffs' interpretation of the code. 8 U.S.C. § 1182(a)(6)(C)(i) renders a foreign national "inadmissible" if they personally engage in fraud or misrepresentation in the visa process. This is a drastic sanction that is not equivalent to the revoked cap number provided by § 1184(g)(3), because under that provision the foreign national is not barred but remains free to seek a new cap number. That substantial difference in outcome undermines Plaintiffs' position because it shows that Congress recognized a distinction between situations where an employee is culpable and where the employee is blameless. And Plaintiffs construction requires me to read a word into the statute: nowhere does it specify that a cap number can *only* be revoked through an individual's own fraud or misrepresentation. *See Parcha v. Cuccinelli*, No. 20-15, 2020 WL 607103, at *9 (E.D. Tex. Feb. 7, 2020) ("Under the statute's plain language, revocation authority is broadly conditioned on a finding of fraud or willful misrepresentation. Nothing in the statutory text limits the scope of that authority to wrongful conduct committed by any particular party.").

Plaintiff's interpretation would require USCIS to somehow uncouple cap numbers from their underlying visas, effectively creating a windfall opportunity to a cap number recipient where the agency later determines that the visa itself was obtained through an employer's fraud. Because H-1B visas are connected to specific employers, such a scheme is hardly intuitive and cannot be

13

readily discerned from the statutory language. Rather, from a systemic perspective, it makes far more sense that individuals whose visas are revoked through their employers' fraud lose their cap numbers but remain free to seek new employment with new cap numbers. And here, the agency submitted a declaration that Plaintiffs are still permitted to do just that. *See* Dec. of Sharon Orise at 7 (ECF 13-1) ("USCIS has not found a single Plaintiff ineligible for the H-1B visa lottery. Rather, based on current information, there is nothing preventing the Plaintiffs from re-entering the H-1B lottery through a different company."). Moreover, in practical terms, Plaintiffs' proposed remedy would seem to require an expansion in cap numbers that would violate the statute. I therefore conclude that Plaintiffs are unlikely to succeed on the merits as to Count III.[10]

## IV. Conclusion

For the reasons stated above, Plaintiffs' motion for a preliminary injunction will be denied. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge

---

[10] Plaintiffs also offer a cursory argument that the agency failed to adhere to its procedures in revoking their cap numbers because it did not provide them with notice of "derogatory information" and an opportunity to respond. Plfs.' Mot. at 25. They cite 8 C.F.R. § 103.2(b)(16) for this requirement, but that regulation is specific to an "applicant or petitioner," which is the employer, not the beneficiary employee. And the agency did offer the employers such notice and opportunity to respond.